**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

FERTICAL GUAYANA, C.A.,
a Foreign Corporation,
      Plaintiff

     v.                                  C.A. No. 12-870-ML

MAVERICK EQUIPMENT
MANUFACTURING, INC.,
a Delaware Corporation,
      Defendant


**MEMORANDUM OF DECISION**


    The plaintiff in this breach of contract litigation, Venezuelan corporation Fertical Guayana, C.A. ("Fertical"), was–at the time the pertinent events occurred–engaged in dolomite mining in Venezuela. To avoid using dynamite for the extraction process, Fertical purchased two hydraulic hammers from defendant Maverick Equipment Manufacturing, Inc., a Delaware corporation. Fertical had the hammers shipped to Miami, where it engaged Meco Miami, Inc. ("MECO") to install the hammers on two Caterpillar excavators Fertical had purchased for that purpose. The excavators with the installed hammers were then shipped to Venezuela; shortly thereafter, the mine where Fertical conducted the dolomite excavation was expropriated by the Venezuelan

1

government. For reasons that are at the heart of this dispute, Fertical was never able to use the hammers as intended.

## I. Procedural History

On November 28, 2012, Fertical filed a complaint in this Court[1] against Maverick for breach of contract (Count I), breach of warranty (Count II), and unfair or deceptive acts in violation of Florida's "Little FTC" Act (Count III). (Dkt. No. 1). Two months after discovery closed, on the date dispositive motions were due, Fertical sought to amend its complaint to (1) include Maverick's sole shareholder, Sean M. Raimbeault as an additional defendant; and (2) add certain allegations regarding the labeling and origins of the hammers. (Dkt. No. 18). Following a telephonic hearing, the motion was denied. Text Order from March 18, 2014.

On April 24, 2014, this Court issued a "Trial Notice," setting jury empanelment for June 11, 2014. (Dkt. No. 26). On May 16, 2014, the Court ordered Fertical to file its pretrial memorandum on or before May 23, 2014. (Dkt. No. 30). Instead of filing a pretrial memorandum, Fertical attempted to "voluntarily" dismiss without prejudice its claims against Maverick pursuant to Fed. R. Civ. P. 41(a) by unilaterally filing a "Notice" to that

---

[1]

As indicated by Maverick's counsel during trial (and discussed in Section VI, *infra*), "this matter was originally filed in Florida and then removed. It was dismissed down there and removed up here." Tr. II 103:6-8.

effect. (Dkt. No. 31). After Fertical was advised that Maverick would not agree to a dismissal without prejudice, Fertical filed its pretrial memorandum on June 2, 2014. (Dkt. No. 35). Trial commenced on June 12, 2014.

The Court conducted the two-day trial without a jury.[2] Fertical presented the testimony of four witnesses, including that of Francisco Fernandez ("Fernandez"), principal of Fertical; Alvaro Michael Vazquez ("Vazquez"), V.P. of MECO; Luis Melgar-Agostino ("Melgar"), an agronomic engineer in whose care the excavators were eventually placed; and Sean Raimbeault ("Raimbeault"), Maverick's president and sole shareholder, who was also the sole witness testifying on Maverick's behalf.

At the close of Fertical's case, Maverick made a motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. The Court reserved on the motion and Maverick proceeded with the presentation of its defense.

In accordance with the Court's instruction, Maverick filed a post trial brief on July 2, 2014 (Dkt. No. 38), and Fertical filed its corresponding post trial brief on July 16, 2014 (Dkt. No. 39).

---

[2]

Fertical advised the Court that it waived its right to proceed before a jury; Maverick consented to a bench trial.

## II.   Standard of Review

Federal Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1).

As explained by the First Circuit Court of Appeals, "Rule 52(a)(1) is designed to ensure not only that the parties are adequately apprised of the district court's findings and rationale but also that a reviewing court will thereafter be able to evaluate the bona fides of the district court's decision." Valsamis v. Gonzalez-Romero, 748 F.3d 61, 63 (1st Cir. 2014). The directive of Rule 52(a) "'impose[s] on the trial court an obligation to ensure that its *ratio decidendi* is set forth with enough clarity to enable a reviewing court reliably to perform its function.'" Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997)(quoting Touch v. Master Unit Die Prods., Inc., 43 F.3d 754, 759 (1st Cir. 1995)). "When the evidence presented at a bench trial supports plausible but competing inferences, the court's decision to favor one inference is not clearly erroneous." Torres-Lazarini v. United States, 523

F.3d 69, 72 (1st Cir. 2008)(citing <u>Cape Fear, Inc. v. Martin</u>, 312 F.3d 496, 500 (1st Cir.2002)).

In addition, a Court may render a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial;" however, the Court may decline to do so "until the close of the evidence." Fed. R. Civ. P. 52(c). Judgment under Rule 52(c) is appropriate "[w]hen a party has finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the party's position." <u>Morales Feliciano v. Rullan</u>, 378 F.3d 42, 59 (1st Cir.2004). In making a determination pursuant to Rule 52(c), the Court "need not consider the evidence in a light favorable to the plaintiff and may render judgment for the defendant if it believes the plaintiff's evidence is insufficient to make out a claim." <u>Geddes v. Northwest Missouri State Univ.</u>, 49 F.3d 426, 429 n. 7 (8th Cir.1995). Moreover, the Court is tasked with resolving any conflicts in the evidence and "'decide for itself where the preponderance lies.'" <u>Morales Feliciano v. Rullan</u>, 378 F.3d at 59 (citing 9C Wright & Miller, <u>Fed. Prac. & Proc. Civ. § 2573.1</u>, at 497–99).

The following constitutes the Court's findings of facts and conclusions of law after considering all the testimony and evidence introduced by the parties at the two-day bench trial

before the Court.

## III. Findings of Facts

In 2008, Fertical operated a dolomite mine near Upata in the state of Bolivar, Venezuela. Tr. I 9:23-10:13. After Fertical's principal Fernandez decided to employ hydraulic hammers in order to avoid using dynamite, he purchased two Caterpillar excavators to which such hydraulic hammers were to be attached. Tr. I 10:13-15, 11:23-25, 15:9-13. In January 2009, Fernandez contacted Chrystian Estrada ("Estrada"), whose name he found on a website. Tr. I 16:1-17:1. Following a telephone conversation, Estrada followed up with an e-mail dated January 19, 2009 to Fernandez, in which he provided additional information on hydraulic hammers. Ex. 14[3]. Estrada stated in his e-mail that "Maverick is a 100% American manufacturer which ensures product quality and it guaranties its equipment for 3 years." Id. Subsequently, Fernandez met Estrada as well as Maverick's president, Raimbeault, at a machinery auction in Florida. Tr. I 22:3-10.

Fernandez expressed to Estrada that he required support for the equipment, Tr. I 24-8-15. According to his testimony at trial, Fernandez expected that Maverick's mechanics would install the hammers to the excavators and that Maverick would offer

---

[3]
    The exhibit is (as are several others) in Spanish, but was accompanied by a certified English translation.

6

support, training, and warranty. Tr. I. 25:24-26:6, 26:21-25. Fernandez acknowledged, however, that Maverick was not supposed to do anything "regarding the pressure of hydraulic fluid." Tr. I 27:1-4. After speaking to Estrada, Fernandez sent an e-mail to the Maverick sales department, in which he explained the reason for purchasing the hammers and requested additional information, including (1) sales or services in Venezuela; (2) the applicability of a warranty in Venezuela; (3) training in operation and maintenance; (4) a visit from Maverick to Venezuela; and (5) whether it would "be possible to installed the equipment and left it operative in Miami before embarking the machine."[sic] Ex. 22 at 3.

Fernandez eventually bought the hammers from Maverick directly, after Raimbeault recommended to him a different model than the one Estrada had recommended. Tr. I 32:20-22, 33:1-7, 34:16-36:6. In response to Fernandez's inquiry, Raimbeault informed him that Maverick was connected with the Sunimca dealer and service center in Venezuela; the warranty would run for three years; training and maintenance was included at no charge; and someone from Maverick would spend two days with Fertical's staff to conduct training. E-mail dated January 23, 2009, Ex. 22 1-2. Raimbeault also made a recommendation for a model that would suit Fernandez's needs. With respect to installation of the hammers,

Raimbeault's e-mail reads as follows:

> We will install and test the Hammers on your machines
> in Miami at no charge, as we have a dealer and service
> center in Miami. Our factory technicition [sic] will
> fly to Miami to personaly [sic] set up your excavators
> with the hammers, test your hydraulic pumps and relief
> settings, and install the hammers on the 345BL's. They
> will be ready to work when they reach Venezuela. Ex. 22
> at 2

As instructed by Fernandez, the hammers were to be delivered
to MECO, a company in Miami that had sold one of the excavators
to Fertical (the other one was purchased from Caterpillar
directly) and at whose site the excavators were already located.
Tr. I 53:25-54:3, 70:15-20. Maverick delivered the hammers to
MECO in November 2009. Tr. I 54:10-14. Although Maverick was
tasked with attaching the hammers to the excavators, MECO was
responsible for the hydraulic line that ran from the hammer to
the excavator. Tr. I 81:19-23. As explained by Raimbeault, whose
testimony provided a clear and precise explanation of the
mechanics of the machines in question, Maverick only fits the
hammers it sells to the bracket of an excavator and then pins
them on. Tr. II 106:20-24. After that, the excavator has to be
tested hydraulically. Id. Maverick has no involvement with
adjusting the hydraulic pressure in excavators or the
installation of an additional valve to make the hammers
functional. Tr. II 107:7-18. According to Reaimbeault, Maverick
works only on hammers because there are hundreds of excavator

brands, all different from one another. Moreover, Maverick does not have the Caterpillar software for the laptop that is required to adjust the pressure on a Caterpillar excavator. Tr. II 107:20-25.

In order to finalize the installation of the hammers to the excavators, Fertical's excavators needed to be equipped with a "third valve" kit. Tr. I 54:18-55:3. One of the excavators already had a Caterpillar factory-installed third valve system; the other excavator was to be fitted by MECO with a generic system. Tr. I 55:4-15, 81:22-25. Because an auxiliary kit has many parts, the fitting process can take several days. Tr. II 108:5-12.

An initial visit by Raimbeault and Maverick's lead technician Kenny Gallucci ("Kenny") to MECO in Miami was unsuccessful because the excavators were in the paint shop and were being reconditioned. Tr. II 113:20-24. Prior to this visit, Raimbeault advised Fernandez[4] that the excavators had to put out "2300 to 2702 PSI of pressure, between 50 and 60 gallons per minute of hydraulic flow and 100 pounds of back pressure to the tank." Tr. II 109:18-110:7. Raimbeault also advised Fernandez to

---

[4]     Like Fernandez, Raimbeault acknowledged that there were some communication difficulties between the two principals because Raimbeault does not speak Spanish and Fernandez's English is limited. Tr. II 109:21-25.

have Caterpillar perform the flow and pressure tests and adjust the pressure accordingly. Tr. II 111:3-10. As documented in several e-mails (Ex. 34, a multi-page exhibit that is paginated only in part), Maverick's technician reported on November 11, 2009, that one of the excavators had an incomplete hydraulic kit and that the other excavator was in the paint section and could not be accessed. Ex. 34, page 22 of 38.

On November 18, 2009, after Maverick was informed that MECO had made certain adjustments to the machines, Kenny, together with Raimbeault, returned to Miami. Tr. I. 56:13-18. On that occasion, Kenny pinned a hammer to the excavator with the Caterpillar factory kit; however, the flow control valve was missing from the kit and no testing could be done. Tr. II 111:21-112:16. The other hammer could not be installed because the kit for the second excavator had not yet been received by MECO. Tr. II 112:17-23.

By e-mail dated December 4, 2009, Raimbeault promised Fernandez that he would send his technician Kenny ("Kenny") to Miami at no charge, to make sure the second excavator was correctly set up for the hammer. Ex. 34. Kenny returned for a third time on December 7, 2009, after he was informed that the second kit had been installed. Tr. II 115:2-13. By that time, one of the excavators had already been sent to Venezuela; the machine

with the factory kit was still at the MECO yard. Tr. II 116:21-23. However, there were continuing problems with the hydraulic pressure and a missing adjustment valve, which precluded Maverick from completely installing the hammer to the excavator and test its performance. Tr. I 56:1-6. Raimbeault sent a further e-mail to Fernandez, informing him that Kenny was at MECO to "flow and pressure test" the second excavator, but that the hydraulic kit did not work properly. Ex. 34.

Fernandez (who was not present in Miami) asked MECO to solve the problem or to repair the missing valve. Tr. I 56:9-12, 82:16-22. Fernandez advised Raimbeault that MECO planned to have Kelly Tractor/Caterpillar repair the kit and valve. Ex. 34. It is not entirely clear whether MECO attempted to complete the hydraulics or whether it requested Caterpillar to perform that service. However, Fernandez conceded at trial that it was MECO's, not Maverick's obligation to get the hydraulics working and calibrated properly. Tr. I 83:1-11.

Raimbeault, in turn, informed Fernandez that the first excavator would not work properly because the requested valve was not installed prior to shipment. Id. Raimbeault included the following caution in his e-mail: "Please, DO NOT RUN THE HAMMER WITH THE PRESSURES AS THEY EXIST NOW ON THE FIRST EXCAVATOR. The Hammer will be damaged or destroyed if that valve is not

installed properly." Id., Tr. I 62:18-23. Raimbeault also advised Fernandez that Fernandez needed to (1) acquire the correct valves and have them installed; and (2) have Venequip, the Caterpillar dealer in Venezuela, adjust the flows and pressures in the machines. Tr. II 118:15-25. Once the adjustments or calibrations had been performed and the machines were ready, Maverick was to send a technician to Venezuela to inspect and complete the installation and to train Fertical's staff. Tr. II 120:22-121:4.

Although the hammers had not been calibrated or tested in Miami, they were installed/pinned to the excavators and shipped to Puerto Ordaz, Venezuela, on December 24, 2009, where they remained in customs for fifteen days. Tr. I 85:21-23. After the excavators cleared customs, they were stored in Puerto Ordaz, at the yard of Fertical's mechanic, Luis Melgar ("Melgar"), where they remained because, by that time, the mine had already been expropriated by the Venezuelan Government. Tr. I 88:23-89:12.

According to Fernandez, he was informed by MECO's vice president, Michael Vazquez[5] ("Vazquez") that the hydraulic system was functioning properly before the machines were shipped out. Tr. I 83:19-84:1. Fernandez conceded, however, that he was not present at the testing and that he had been cautioned by

---

[5]     The Court was advised that one of the attorneys representing Fertical is Vazquez's brother.

Raimbeault not to use the hammers because they were not functional before they were shipped to Venezuela. Tr. I 84:20-23, 85:4-8. Although Fernandez knew the hammers had not been tested and were not operational, he decided to ship the excavators with the attached hammers to Venezuela because they were needed at the mine. Tr. I 86:9-25.

In an e-mail dated December 24, 2009,[6] Fernandez acknowledged his understanding that the hammers were not properly installed on the excavators; that the hydraulic systems would have to be calibrated; that the first excavator was delivered to Miami without the proper valve; that the hammers were not operational; and that their use in this condition could "jeopardize" the guarantee. Ex. 28 at 2. In response, Raimbeault promised to schedule Kenny to travel to Venezuela and finish installation of the hammer. E-mail from January 10, 2010. Id.

At some point in January 2010, the Venezuelan government expropriated the mine, together with the machinery therein. Tr. I 75:17-18. The excavators and hammers were not at the mine during the expropriation; rather, they were still stored at Melgar's yard. Tr. I 73:10-14. Following the expropriation, Fertical no

---

[6]
    Some of Fernandez's e-mails consist of the Spanish original, together with what appears to be a machine-translated English version. See e.g., Ex. 28 at 1 ("[w]here you cannot read mi Spanish E-mail sent to you and Michael, I translated the message for you.")

longer had any use for the excavators and hammers. Tr. I 78:13-23. Fernandez then attempted to sell the excavators, but the prospective buyer was only interested in excavators with properly installed, functioning hammers. Tr. I 77:20-78:2.

In mid-February 2010, Fernandez again requested that Maverick send a technician to Venezuela to complete adjustments to the installation of the hammers. Ex. 30, Ex. 31. Raimbeault agreed to send a technician in March; Raimbeault also requested photographs of the valves that had been installed on the excavators. Ex. 32. After Fernandez e-mailed pictures of what he assumed were the valves in question, Raimbeault sent David Morrisey ("Morrisey")[7], one of Maverick's mechanics, to Venezuela. Tr. I 69. Raimbeault tasked Morrisey "to do the flow and pressure test of the hammer and to visually verify that the two valves on the two different excavators had been installed." Tr. II 152:13-16. As Raimbeault candidly admitted at trial, he did not send his lead technician (Kenny) to Venezuela because it was apparent from the photographs he had been sent by Fernandez that parts of the excavator kits were still missing. Tr. II

_____

[7] Fertical's mechanic Luis Melgar referred to Morrisey as "Kenny" throughout his testimony. However, it is undisputed that it was Morrisey who spent three days at Melgar's yard and that Kenny (Gallucci) never went to Venezuela. Melgar testified with assistance of an interpreter; Morrissey, who does not speak Spanish, used "Google translation" to communicate with Melgar in Venezuela. Tr. II 33:2-5.

152:22-25. Instead, he sent a mechanic to get "eyes on the problem" and try to help Fernandez. Tr. II 155:14-156:3.

On his part, Fernandez represented to Manual Guerrera from Maverick that the "CAT hydraulic technician will be on site to check the equipment and adjust it according to its 'pressure and flow' requirements;" and he requested that Maverick's technician bring two valves to be installed in one of the excavators. March 10, 2010 e-mail from Fernandez to Guerrera. (Ex. 33, unpaginated).

As it turned out, Caterpillar had not done any installation or calibration, and the only mechanic present was Melgar, who was not an expert in hydraulic hammers. Tr. II 28:20-29:3. Morrisey tested the hammers by opening the valves, charging the hammer with nitrogen and checking the flow with a flow meter. Tr. I 131:8-13. Melgar observed that the flow meter showed a hydraulic pressure of "2,400, more or less. Twenty-five gallon." Tr. I 132:2-4. The pressure at the main pump was "4,800, almost 4,900" and the flow was 50 or 49 gallons. Tr. I 133:5-9. The hammer on the excavator with the MECO-installed kit[8] was operating slowly and a leak appeared. Tr. I. 134:12-14, Tr. II 4:20-5:5, 6:8-13. Morrissey removed a cover, dismantled a valve, and discovered

---

[8]

It appears that this excavator was misidentified as Excavator A (which actually had the factory-installed kit) during Melgar's testimony. Tr. II 108:19-20.

that a seal had been broken. Tr. 134:20-22, 135:10, 135:24-136:4. However, even after new seals had been installed, the leak reappeared. Tr. I 3-7.

Morrisey left Venezuela after three days and the hammers remained inoperative. Tr. II 18:17-19:17. As Raimbeault explained in his testimony, he specifically instructed Morrissey to determine which valves were installed and to "put the flow and pressure meter on the end of the excavator boom pipes on the kit to see how bad the flow and pressure still were." Tr. II 123:17-10. Raimbeault also testified that the required flow was 50-66 gallons per minute, not 25 gallons, as Melgar observed. Tr. II 124:3-16.

After Morrisey left Venezuela, Melgar called Sunimca, a dealer/representative for Maverick in Venezuela, for support, but he was advised that Sunimca did not handle repairs. Tr. II 19:20-23. Melgar also called Venequip, a representative for Caterpillar—with the same result. Tr. II 19:24-21:9. Melgar did not attempt to repair the hammers by himself because they were high-performance hammers and he had been informed that the hammers were under warranty and could not be touched. Tr. II 21:10-16.

Following the return of Maverick's technician from Venezuela, Raimbeault again advised Fernandez of the corrections

that had to be made before the hammers could be tested and made operational. Tr. II 128:4-14. According to Raimbeault (and not refuted by Fertical), he offered to repair the hammers at Maverick's expense, if they were actually broken. Tr. II 132:3-10. Raimbeault offered to connect Fernandez with Sunimco, but Fernandez refused, wanting to deal with Raimbeault directly. Tr. II 132:10-14. Raimbeault also instructed his attorney to contact Fernandez' attorney and inform him that Maverick would repair or replace the hammers if Fernandez returned them to the United States. Tr. II 132:15-20. According to Fernandez, he was never apprised of this offer. Tr. I 91:8-15.

Eventually, Fernandez had the hammers removed from the excavators and replaced with the originally installed buckets, and then sold the excavators. Tr. I 72:10-11. The hammers were never sold and, at the time of the trial, they remained in Melgar's yard. Tr. I. 72:21-24. According to Melgar, one of the hammers is inside his workshop and the other one is kept outside "but covered." Tr. II 26:6-17. As Raimbeault explained in some detail, the hammers, which have now been stored in humid conditions for four years (one under a roof, one under a tarp) are likely scrap metal because they will have rusted without lubrication and other proper storage measures. Tr. II 138:7-139:17.

## IV.  **Breach of Contract**

In the Complaint, Fertical asserts that it entered into a contract with Maverick for the sale and installation of the hammers; that Fertical met its obligation by paying $90,000 to Maverick; and that Maverick failed to deliver and install operative hammers, which were "inoperative and failed to perform as promised." In addition to the sales price, Fertical asserts that it incurred costs of $35,850 for shipping, taxes, customs, and warehouse. Tr. I 74:1-5.

There is no dispute that Fertical and Maverick entered into a binding contract and that Fertical paid the sum of $90,000 for the purchase of the hammers. Although the parties apparently did not commemorate their agreement in a formal, written contract, the record of their transactions, particularly e-mail correspondence between Raimbeault and Fernandez, documents their understanding. It is noted, however, that Raimbeault does not speak any Spanish and that Fernandez's English has some limitations. Although both sides attempted to overcome their linguistic difficulties with the help of bilingual employees and/or acquaintances and with the aid of computer assisted translation, it is apparent that the understanding between the parties was not always complete. Nevertheless, the written record, together with the testimony at trial, gives a clear

18

picture of the events as they occurred.

As Fertical correctly points out in its post-trial memorandum, Raimbeault promised in his January 23, 2009 e-mail that Maverick would install the hammers on Fertical's excavators at no charge "as we have a dealer and service center in Miami." Ex. 22 at 2. Raimbeault further assured Fernandez that Maverick's factory technician would fly to Miami to set up the excavators with the hammers, test the hydraulic pumps and relief settings, and install the hammers on the Caterpillar excavators. Id.

As established at trial, Maverick shipped the hammers to MECO in Miami at Fertical's direction. Previously, Fertical had purchased one excavator from Caterpillar which already had the required kit for attaching one of the hammers; Fertical purchased the second excavator from MECO. MECO was then tasked with painting the excavator with the factory installed kit and installing a generic kit on the second excavator. Maverick's lead technician Kenny made three separate trips—on the first two occasions accompanied by Raimbeault himself—to Miami in order to install the hammers to the excavators.

On Kenny's first visit, the excavators were still being painted and/or reconditioned. On the second visit, one of the hammers was installed on the excavator (with the factory installed kit), the second excavator was still missing a kit. The

factory installed kit, however, was missing parts, including the flow control valve; therefore, no testing could be performed on the hammer. At that time, Maverick informed Fertical that the hammers could not be tested and/or operated because the excavators were not ready and/or complete. A third visit by Kenny was no more successful. One excavator had already been shipped to Venezuela without being calibrated or tested and the kit on the remaining excavator was still incomplete. Raimbeault advised Fernandez accordingly and also conveyed to MECO's V.P. Vazquez that the machines had to be calibrated properly by Kelly Tractor/Caterpillar. In addition, Raimbeault cautioned Fernandez that the hammers could not be used in their present condition. Nevertheless, Fertical shipped the second excavator to Venezuela as well, where both were placed in Melgar's yard.

In the interim, the Venezuelan government expropriated Fertical's mine and Fertical no longer had any use for the hammers. Fertical attempted to sell the excavators, but the prospective buyer was interested only in excavators with functioning hammers. Fertical then called on Maverick for assistance to make the hammers operational. Having ascertained that the kits were still not complete and that Fernandez had not, as advised, contacted Sunimco to have the excavators properly fitted and calibrated, Raimbeault sent one of his mechanics to

Venezuela to flow and pressure test the excavators with the hammers attached. Because the necessary work had not been done in either Miami or in Venezuela, the hammers could not be tested and Maverick's mechanic left. Eventually, Fertical sold the excavators with their original bucket equipment and the hammers were left in Melgar's yard.

At no time was it established, either prior to litigation or in the course of the trial, that the hammers were actually defective or non-operational. Maverick was obligated to install the hammers to the excavators, which it did—once MECO finally had the excavators prepared. It is undisputed, however, and Fernandez expressly acknowledged, that the hydraulic systems on the machines had to be properly calibrated; that the installation of the equipment had not been concluded by the time the machines were shipped to Venezuela; and that the machines were still lacking certain valves that were necessary to make the hammers operational. December 24, 2009 e-mail from Fernandez to Raimbeault (Ex. 34 non-paginated).

The undisputed facts of the case establish that it was impossible for Maverick to test the hammers or to provide any training in their operation. Rather, it was the incorrect and/or incomplete installation of the MECO kit, as well as the failure of either MECO or Fertical to engage Caterpillar to perform the

necessary calibration which precluded performance of Maverick's additional obligations. By contrast, there has been no evidence that the hammers were defective and, under those circumstances, Fertical has not met its burden to establish that Maverick breached the agreement between the parties.

## V.    **Breach of Warranty**

Regarding this claim, Fertical asserts that (1)"while being used for its [sic] intended purposes, the hammers malfunctioned and were inoperative;" and (2) "[d]espite multiple demands by [Fertical], to date, [Maverick] has refused to either repair or replace the Hammers." Complaint ¶¶ 46, 48. The Maverick limited warranty (the "Warranty") for hydraulic hammers includes the following provision:

> If a defect arises occurring in the normal and suitable use and operation of the attachment, and a valid warranty claim as well as the covered product(s) are received by Maverick™ or its authorized and designated service center/dealer during the warranty period, at its option, and to the extent permitted by law, Maverick™ will either (i) furnish a replacement part for any warranted part that fails by reason of defective material or workmanship using new or refurbished parts or, at Maverick's option, (ii) exchange the product with a product that is new or refurbished and is the [sic] functionally similar to the original product. A repaired or replaced product and/or part(s) will assume the balance of the applicable warranty period from the date of the original retail purchase by the original end-user purchaser of the product ("Warranty Period"). There is no additional warranty period. When a product or part is replaced, pursuant to the terms of this limited warranty, the replaced product or part becomes the sole

property of Maverick™. <u>It is the original end-user purchaser's obligation to report the defect and return the failed part to Maverick™ or its designated service center/dealer (at Maverick™'s option) for evaluation and failed part replacement within Ten (10) days of the occurrence of the defect.</u> Should it be determined (at the sole discretion of Maverick™) that the product is not covered under this Warranty, the original end-user purchaser agrees that it will become responsible for any and all charges including (but not limited to) shipping, diagnosis, repair, and/or service charges. Limited Warranty, Ex. H at Page 1 of 2.

As already noted in Section IV herein, it is undisputed that the hammers were never used for their intended purpose, as the mine had already been expropriated and the hammers never moved from Melgar's yard. Moreover, Fertical provided no evidence, in the form of expert testimony or otherwise, that the hammers were defective or inoperative. Because the excavators had never been properly set up to accommodate the hammers (an obligation that undisputedly did not fall on Maverick), the hammers had never been tested and never had an opportunity to malfunction. Raimbeault provided credible testimony that he had repeatedly offered to connect Fertical with Sunimco—a suggestion that Fernandez rejected—or to replace or repair the hammers if Fertical returned them to the United States—an offer Raimbeault was still extending from the witness stand.

On his part, Fernandez took the position that it was Maverick's responsibility to ship the hammers back to the United States, an assertion that is clearly inconsistent with the terms

of the Warranty. At the same time, Fernandez testified that he never received any communication that Maverick offered to repair or replace the hammers in the United States. Fernandez flatly denied ever having received the warranty—contrary to Raimbeault's testimony that he gave it to Fernandez personally. Notwithstanding this assertion, however, Fernandez advised Melgar not to operate or work on the hammers because that might invalidate the warranty, which is consistent with at least one of the Warranty's limitations: "This limited warranty does not cover, and is null and void if . . . (vi) the product has been serviced or repaired by anyone who is not a representative of Maverick™ or an [sic] Maverick™ Authorized Service Provider,..." Ex. H Page 2 of 2. Fernandez also specifically inquired, prior to purchasing the hammers whether "[t]he guarantee of three years, is applicable if the equipment is in Venezuela," establishing that he was certainly aware of the Warranty. January 23, 2009 e-mail from Fernandez to Maverick's sales department, Ex. 34 at 30.

In sum, Fertical did not establish that the hammers were defective and/or that the Warranty was triggered, nor did Fertical comply with the express requirement under the Warranty to return the hammers to Maverick or to a Maverick authorized dealer/service center. For those reasons, the Court finds that Fertical has not met its burden of establishing a breach of

warranty claim.

## VI.  Violation of Florida's "Little FTC" Act

Fertical's final claim (Count III) alleges unfair or deceptive acts in violation of Florida's "Little FTC" Act. Complaint ¶¶ 51-73 ("This cause of action is brought by [Fertical] pursuant to Florida's deceptive business practices law.) Fertical alleges that Maverick induced it to purchase the hammers by falsely representing that the hammers were "Made in U.S.A." Complaint ¶ 58. Fertical further alleges that "[o]n or about March 15, 2010 [at the time of Morrissey's visit to Puerto Ordaz, Venezuela], [Fertical] experienced mechanical malfunctions, effectively rendering the hammers inoperative and more specifically not fit for its intended purpose." Id. at ¶68. Fertical claims that it "discovered through experts in the hydraulic hammer industry that [Maverick's] hammers are all manufactured in Peoples [sic] Republic of China" and that it is "common knowledge" that such hammers are of inferior quality. Id. at ¶ 70.

At the outset, the Court notes that the parties have generally stated that they agree on Rhode Island as the proper venue for this litigation, see Complaint ¶ 4 (Dkt. No. 1) and Answer ¶ 4 (Dkt. No. 7). In the course of the bench trial, after Maverick brought a motion pursuant to Rule 52 after the close of

Fertical's case, the Court specifically invited counsel for Maverick to "speak to this statutory claim that the Plaintiffs have made under Florida law." Tr. II 103:3-4. In response, Counsel only advised the Court that "this matter was originally filed in Florida and then removed." Tr. II 103:5-9.

Although no further explanation was provided during the proceedings, the Court takes judicial notice that Fertical commenced this litigation in the U.S. District Court of the Southern District of Florida. On September 8, 2011, the federal district court in Florida dismissed Fertical's claims without prejudice on the grounds that (1) exercising personal jurisdiction over Maverick would fail to comply with Florida's long-arm statute and due process; and (2) Florida was not the proper venue for the matter. Fertical Guayana, C.A. v. Maverick Equipment Manufacturing, Inc., Case No. 11-20963 (Dkt. No. 34) S.D. Fla. Sept. 08, 2011. From the Order dismissing the case without prejudice, it appears that—at the time this litigation arose—Maverick had a principal place of business in Rhode Island, although it was organized in Delaware. September 8, 2011 Order at 2 (S.D. Fla. Dkt. No. 34). In dismissing Fertical's original complaint without prejudice, the district court in Florida concluded that "Florida has little interest in adjudicating this dispute." September 8, 2011 Order at 10 (S.D. Fla. Dkt. No. 34).

Subsequently, Fertical re-initiated the litigation in this Court and reasserted its claim against Maverick for violation of Florida state law.

The Court notes that Fertical has not objected to the application of Rhode Island law to Counts I and II in its Complaint, as set forth in Maverick's post-trial memorandum. However, neither party has addressed whether or why this Court should apply Florida law to Count III or how Fertical's claim of a violation of Florida's "Little FTC" Act (Count III) can survive dismissal of Fertical's original complaint by the U.S. district court in Florida.

It is well established that a federal court sitting in diversity must apply the "substantive" law of the forum state according to the Federal Rules of Civil Procedure. Commercial Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 772-73 (1st Cir.1994). "In cases involving the law of a state or country other than the forum state . . . a district court sitting in diversity must engage in a two-step inquiry." Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, 145 F.3d 463, 479 (1st Cir. 1998). "First, the district court determines whether a particular matter is procedural or substantive for Erie purposes. If the matter is procedural, federal law is applied, and if substantive, the court follows the law of the forum

state." Id. "Second, if a choice of law must be made, for example, because a contractual choice-of-law clause is at issue or because a tort was committed in another jurisdiction," id., "[i]n a diversity case, '[u]nder Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 [61 S.Ct. 1020, 85 L.Ed. 1477] (1941), a court ordinarily must apply the choice-of-law rules of the State in which it sits.'" In re Volkswagen and Audi Warranty Extension Litigation, 692 F.3d 4, 14 (1st Cir. 2012)(quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 243 n. 8, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); see also Auto Eur., LLC v. Conn. Indem. Co., 321 F.3d 60, 64 (1st Cir.2003) ("A federal court sitting in diversity jurisdiction must employ the choice-of-law principles of the forum state....")).

Given that Fertical is a Venezuelan company; Maverick is organized in Delaware (although it had business quarters in Rhode Island at one time); the Complaint contains no allegations of any events occurring in Florida (other than delivery of the hammers to MECO at Fertical's direction); and the federal district court in Florida concluded that (1) Fertical could not bring a claim against Maverick in Florida, and (2) Florida had no interest in having the case litigated there, Rhode Island law only is applicable in this case.

Even if the Court were to consider Fertical's claim of

deceptive business practices, Fertical failed to support its allegations at trial. Although Fernandez generally asserted that he believed American products to be of superior quality, Fertical presented no evidence that the hammers were manufactured in China. Furthermore, as set forth in some detail in sections IV and V, *supra*, it was not established that the hammers actually malfunctioned or that they were defective.

## Conclusion

After a review of the entire record, the Court finds that Fertical has failed to carry its burden to show, by a preponderance of the evidence, that Maverick breached the contract between the parties. The Court also finds that Fertical has not proved a breach of the Warranty applicable to the hammers. Finally, as already stated herein, Fertical has provided no basis for bringing a case in this Court for an alleged violation of Florida law, after it had already been determined by a U.S. district court in Florida that it lacked jurisdiction over Maverick and that Florida had no interest in having the case

litigated there. For all those reasons, judgment enters for Maverick.

SO ORDERED.

/s/ Mary M. Lisi
Mary M. Lisi
United States District Judge

September 3, 2014